TENERIA " EL POPO ", S. DE R. L., Plaintiff, *v.* HOME INSURANCE COMPANY et al., Defendants.

Supreme Court, Trial Term, New York County, December 16, 1954.

*Robert F. Doran* for plaintiff.

*John W. Ansell* for Home Insurance Company, defendant.

*Tallman Bissell* for Torm Line, defendant.

*Daniel L. Sullivan* for Fulton Fire Insurance Company of New York, defendant.

*Edward L. Smith* for New York and Cuba Mail Steamship Company, defendant.

STEUER, J. This action involves sixty bales of goatskins which were purchased by plaintiff from Edmond Weil, Inc., while in transit by steamer from Rio de Janeiro to New York. On arrival in Hoboken the plaintiff's forwarding agent had them transferred to a steamship docked in New York which delivered them to Tampico, Mexico, from whence they were taken by truck to plaintiff's plant at Mexico City. Upon arrival there the surface of every bale was found to be infested with the larvae of beetles which had eaten the skins to such an extent that approximately half of them were rendered worthless. Suit is against the Torm Line, the operator of the steamship on the voyage from Brazil to Hoboken; The Home Insurance Company which issued a policy of insurance on the skins for that voyage; New York and Cuba Mail Steamship Company which operated the vessel on the voyage from New York to Tampico, and Fulton Fire Insurance Company which insured them on that voyage.

It is possible from the above statement that the bales could have become infested at any one of five stages in their shipment — prior to leaving Brazil, on the steamship voyage to New York, while being transshipped, on the voyage to Tampico, or while being trucked to Mexico City. Recourse to additional facts is necessary to determine the place indicated by the proof. The bales comprised approximately 20,000 skins, between 300 and 350 to a bale. The bales were made up of the skins themselves, folded in half along the line of the animal's spine and bound together, with a spread skin used as a cover on the ends. The total shipment which had been assembled by a Brazilian dealer for Weil consisted of 222 bales. The dealer purchased them in lots in several villages where the natives procured the skins and prepared them according to the dealer's directions. These directions included treating the skins with an arsenical soap. The purpose of impregnating the skins with this soap is that, if beetle larvae commence to feed on a skin so treated, the arsenic kills them immediately and before they can do any appreciable

damage. The sixty bales in suit were the total output of two villages and, though they were inspected and passed by a representative of the dealer and again spot checked in the warehouse at Rio de Janeiro, it is clear that the arsenical soap was not properly applied. Had it been, the beetle larvae could not have made the headway they did unless the soap had been washed off. There was no claim that this had happened. From this, the defendants have argued that the skins were destroyed from inherent vice. This argument is not sound. There was no obligation to any of these defendants to prepare the bales in any particular way. Nor does the fact that the arsenic treatment was improperly done prove that the bales were infested when loaded. It merely leaves the question open.

The beetle in question is known to science as *dermestes maculatus*. It starts as an egg about the size of the period at the end of this sentence. Five days later the egg hatches, producing a small grub which starts to eat immediately. The grub continues to eat and grow for a period of fifty-seven days, during which time it outgrows and casts its shell case four times. During this time it moves no appreciable distance even to procure food. At the conclusion it changes into a flying beetle which roams around, seeking a hospitable place to lay its eggs. After a few days the eggs are laid and the cycle begins again.

The bales were on the steamer coming to New York for twenty days and on the pier in custody of the defendant Torm Line for nine days more. They were a total of two days in transport to the New York and Cuba Mail Steamship Company and were in the latter's custody for fifteen days. The exact time of trucking from Tampico to Mexico City does not appear but it was a short period.

From this, it is obvious that the eggs could not have been laid and hatched and the skins eaten in the last leg of the journey, the truck ride from Tampico to Mexico City, so that possibility is eliminated.

While the skins were being transported by truck from Hoboken to New York, the truck driver noticed a beetle in one of the bales. He reported that to plaintiff's forwarding agent who, in turn, requested a report from the New York and Cuba's dock superintendent. This officer looked at a few of the bales and could find nothing wrong. He was not an expert and made no careful examination. But had the condition been such as it was when the bales reached the plaintiff, that something was wrong would have been evident on the most cursory examination. This would have been true even if the eating and destruction had not reached

the advanced stage that it did. If the bales had been infested when loaded in Brazil, the destruction must necessarily have reached an obvious stage when they were delivered to the steamship company in New York. As it had not, it follows that they were not so affected when they left South America.

While there is no scientific evidence as to how far *dermestes maculatus* will travel in its flying stage in a search for a suitable place to lay its eggs, the proof is that the distance is generally short, and in transit this is generally to the nearest cargo that will furnish food to its larvae. Infestation therefore presupposes a nearby infested cargo. The cargo plan of the S.S. *Yucatan* on the voyage from New York to Tampico shows that in the near vicinity of these bales there was no cargo on which larvae could have subsisted, hence none from which an egg-laying flyer could have migrated. It follows that all probability of the damage originating in that part of the journey is also eliminated.

As for the period when the goods were in the custody of the trucker between Hoboken and New York, it appears that the bales constituted three truckloads. They were the only goods carried in each load. If contamination occurred during this passage, it must have come from some goods on another truck. For this to happen three separate times is so remote a chance as to be ruled out as a possibility. Note that if one load was infested, sufficient time for the cycle did not elapse after this for the larvae to develop and the resulting egg-layers to infest the bales of the other truckloads.

This leaves the period when the bales were in the hold of S.S. *Agnete Torm* as the only remaining period. In addition to the conclusion which this elimination implies, there is some positive evidence that the damage was started during this voyage. There is that already noted fact of a flying beetle being seen on one of the bales plus the absence of other findings; this would indicate that at the time of transfer the eggs were hatching and, because of their minuteness, were not readily visible to an untrained eye. In addition, damage to some of the bales constituting the balance of the shipment of 222 bales was reported. Upon inspection it was found that this damage was minimal, being a slight scuffing of the exposed portions of skins. This insignificant damage is what would result if the larvae started eating on properly arsenicated matter. They died before they had done any real damage. Nevertheless, this tends to establish that beetles were in the hold of the S.S. *Agnete Torm* and laid eggs during that voyage.

These findings relieve the defendants, New York and Cuba Mail Steamship Company and the Fulton Fire Insurance Company, from liability. The defendant, Torm Line, argues that, even assuming the bales were attacked while in its custody, this does not establish liability on its part because, in and of itself, that does not establish negligence. At common law this defendant is in the position of a bailee for hire and the familiar rule is that, upon proof of delivery in good condition and return in impaired condition, the burden is upon the bailee to go forward with proof to establish that it exercised the care that a reasonably prudent person would take of his own goods. Of course, if an issue is raised on this proof, the burden on that issue would be on the plaintiff. The question does not arise here because this defendant offered no proof at all as to the care or disposition of the bales. This defendant argues that it is relieved of the common-law burden by the provisions of the Carriage of Goods By Sea Act (U. S. Code, tit. 46, §§ 1300–1315). The provision relied on is subdivision (6) of section 1303 which provides that, unless notice of loss is given in writing to the carrier at the time of removal of the goods at the port of discharge, the presumption is that the goods were as described in the bill of lading. This presumption does not survive proof to the contrary (*Fire Assn. of Philadelphia* v. *Isbrandtsen Co.,* 199 Misc. 257). Nor does it, after proof of their real condition, relieve the carrier from showing how it cared for the goods. This carrier is, therefore, liable to the plaintiff for its damage, this being the value of the skins destroyed less 5%, which percentage it is conceded is the usual loss which occurs in the process of curing. This amounts to $7,847.28.

The liability of the defendant, Home Insurance Company, is fixed by its contract. It is therein provided that losses are to be figured on the basis of the sales price of the goods (that is, the price charged by Edmond Weil, Inc.) '' including freight and all charges, plus 10% or 20% on reptile skins.'' The sales price of the damaged goods was $8,259.24 and the freight was $531.60. Plaintiff seeks to include as a '' charge '' the expenses of the forwarding agent to the extent that these involved damaged skins. This is not the intent of the contract. Charges referred to would be those arising on the voyage, certainly not those incurred by the consignee in trans'shipping the goods. The provision for an extra 10% or 20% is peculiarly worded. To give it a rational interpretation, the allowance should be 10% on all skins other than reptile, and on these latter 20%. On this basis, the damage as fixed by the policy would be $9,779.92.

Plaintiff also seeks damages under the so-called sue and labor clause of the policy. This clause, very general in such policies, requires the assured to " sue labor and travel for * * * the defense, safeguard and recovery " to salvage so much of the cargo as possible. It appeared that on arrival of the goods the agent for the Fulton Fire Insurance Company (not this defendant) suggested that a thousand skins be processed to see what could be saved. As a result about half were found to be satisfactory. Plaintiff seeks the cost of processing the skins that turned out to be worthless. This claim can only be substantiated on the basis of the insurance contract, not on the oral agreement, if any, because the latter was not made by this defendant. The work done was not such as has usually been regarded as coming within the provisions of the clause (*American Merchant Marine Ins. Co.* v. *Liberty Sand & Gravel Co.*, 282 F. 514). The work done was not to preserve the property but to convert the skins into leather according to plaintiff's usual methods of manufacture. While to an extent it established what skins were suitable and what were damaged, it neither defended, safeguarded, nor recovered them. No damages under this clause are proven.

Judgment for the plaintiff against defendant, Torm Line, for $7,847.28, with interest from the date action was begun, and against defendant, Home Insurance Company, for $9,779.92, with interest from July 16, 1953. Judgment for defendants, Fulton Fire Insurance Company and New York and Cuba Mail Steamship Company, dismissing the complaint as against them, with appropriate exceptions to all parties. Thirty days' stay and sixty days to make a case.