**MANHATTAN FRUIT EXPORT COR-PORATION, Plaintiff,**

v.

**ROYAL NETHERLANDS STEAMSHIP COMPANY, Defendant.**

United States District Court
S. D. New York.
Dec. 3, 1958.

goods by sea, evidenced by two bills of lading. The contract was made subject to the provisions of the Carriage of Goods by Sea Act [T. 46 U.S.C.A. § 1300 et seq.]. The action was commenced in the City Court of the City of New York by the service of a summons and complaint on October 5, 1954. It was removed to this Court on petition of the defendant on October 15, 1954. The plaintiff served an amended complaint on October 20, 1954.

The plaintiff shipper alleged in its amended complaint the delivery of a shipment of approximately 1,000 cases of plums in good and sound condition to the defendant's vessel, M/S Helena, at the Borough of Brooklyn, New York City, on September 30, 1953, consigned to ports in South America (LaGuaira, Venezuela), specifying that the fruit was to be maintained under refrigerated stowage. The complaint also alleged that the defendant failed to properly and carefully load, handle, stow, carry, keep, care for and discharge the shipment, and that when the plums arrived in port (at LaGuaira, Venezuela) they had become in part spoiled, rotten and unfit for human consumption to plaintiff's damage in the sum of $5,000.

The answer of defendant denied the allegations of the amended complaint that the plums were in good condition at the time of their delivery to defendant; that defendant failed to carry them safely; that they were outturned in a damaged condition; and that plaintiff had suffered any damage. Defendant's answer also pleaded certain special defenses: the failure of plaintiff to file a written notice of loss or damage within three days after delivery of the plums at LaGuaira [T. 46 U.S.C.A. § 1303(6)]; an allegation that the damage to the plums was due to an inherent vice [§ 1304(2) (m)]; and certain other provisions of the Carriage of Goods by Sea Act [§ 1304(2) (c), (i), (n), and (q)].[1] At the trial the defendant's contention was that the plums deteriorated during

Edward R. Loomie, New York City, for plaintiff.

Burlingham, Hupper & Kennedy, New York City, for defendant (Herbert M. Lord and Charles L. Trowbridge, New York City, of counsel).

LEIBELL, District Judge.

This is an action for damages for breach of a contract for the carriage of

---

1. "§ 1304 * * *
   "(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from * * *
   "(c) Perils, dangers, and accidents of the sea or other navigable waters; * * *

the voyage due to an inherent vice; that they were so far advanced in ripening when shipped that they had already reached their marketability; also that when the plums were discharged from the ship at the end of the pier at La-Guaira they were not removed promptly to the Customs shed and they remained too long in the sun.

Failure to give the written notice of damage gives rise only to a presumption that the goods as delivered at the port of discharge were as described in the bill of lading. But the presumption is rebuttable and "does not survive proof to the contrary". Teneria "El Popo" v. Home Ins. Co., 207 Misc. 84, 136 N.Y.S.2d 574. And it does not, after proof of the real condition of the goods at their port of discharge, relieve the carrier from showing how it cared for the goods on the voyage.

Although no formal written notice of claim was filed with defendant or its agents before the plums were removed from the Customs shed on the pier, under an arrangement with defendant's agent hereinafter discussed, the plaintiff and its ultimate consignees orally notified defendant's agent at LaGuaira on October 13th, the date the plums were discharged, when the damage was discovered at the Customs shed on the dock. Three of the ship's officers, the captain, the chief officer and the engineer, on the request of two representatives of defendant's agent at LaGuaira, examined great quantities of damaged fruit of various shippers on the evening of October 13th while the fruit was in the Customs shed at the shore end of the pier. The damage was discovered when some consignees and purchasers found that their shipment of fruit had arrived in damaged condition. "[C]ontents of a good amount of cases although not condemned and received by consignees' customs brokers without taking any exceptions showed signs of advanced spoilage so that additional damage might have been observed upon receipt at ultimate consignees' warehouses", according to the statement of defendant's Caracas agent, in a letter of November 12, 1953 (Ex. 22).

By arrangement between plaintiff's officer Krupnick, who was in LaGuaira at the time, and defendant's local agent, plaintiff's customers, Rodriguez and Berardini, to whom the plums had been sold September 23rd, salvaged what they could of plaintiff's shipment after they removed it to Caracas, seven miles away. They forwarded to plaintiff's agent, Perez y Perez, in LaGuaira about October 20, 1953, statements showing what they realized from the sale of the salvageable plums. Perez y Perez forwarded the statements to plaintiff in New York. On March 9, 1954, plaintiff filed a written claim with defendant's agents in New York, as defendant had been advised plaintiff would do, and annexed thereto the various documents, which plaintiff received through its agent in LaGuaira, relating to the damaged condition of plaintiff's plums and the salvage of about half of the original shipment. Defendant rejected the claim, on the grounds that there was no liability, by letter dated June 2, 1954, although keeping the documents until August 1954. This suit was filed in October of that year.

At the trial the defendant contended that the damage to plaintiff's plums was due to an inherent vice in the plums, and that the deterioration of the plums during the voyage was due to that

"(i) Act or omission of the shipper or owner of the goods, his agent or representative; * * *

"(n) Insufficiency of packing; * * *

"(q) Any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage."

and not to any fault of the defendant. The shipper was required to present some evidence beyond the bills of lading, which acknowledge receipt in "apparent good order and condition", to show the good condition of the plums and that they were fit for the voyage upon their delivery to the carrier. Hecht, Levis & Kahn, Inc. v. The S.S. President Buchanan, 2 Cir., 236 F.2d 627, 631. This the plaintiff shipper did through the testimony of three witnesses (Beach, Stackpole and Fichera) and certain records.

The evidence shows that plaintiff's plums were in good condition and fit to make the voyage to LaGuaira when they were loaded aboard the M/S Helena from an Erie refrigerated barge alongside the ship at a pier in Brooklyn, N. Y. on September 30, 1953. Plaintiff's plums were President plums and were shipped from Auburn, California, in a refrigerated car on September 12, 1953. The car had a bunker capacity of 1,000 pounds of ice and with a fan that operated by an attachment to the car wheels. The car arrived at the Erie's north yards at Jersey City on September 21st. The contents were examined by Mr. Beach, a fruit products inspector for the Department of Agriculture on September 22nd at 11:45 A.M. He testified to the temperature as about 40°F at the top layers of the boxes, where it would be at its highest. The railroad notice of arrival was for a shipment of 1,000 boxes of plums, but one box was completely empty, another was broken and some of its contents were scattered on the floor when delivery was made at Seaboard Terminal and Refrigeration Company. Mr. Beach examined the boxes of plums in the top layer and reported their condition in an official document as follows:

"Generally hard to firm, few firm ripe and generally dark purple with deep bloom, few full color. No decay." (Ex. 1)

Beach had been inspecting fruit for over twelve years at the time. In his opinion the plums, under proper storage conditions, would be good for six or eight weeks. He did not claim to be an "expert", but he had the knowledge gained by long experience as an inspector of fruit.

On September 24th the car was delivered to the siding of the refrigerated warehouse of Seaboard Terminal and Refrigeration Company in Jersey City and was unloaded; and the plums were stored in room 73 of the warehouse where a temperature of 31 to 32°F was maintained. Mr. Stackpole, who at that time had been inspecting fruits for about eleven years, examined the contents of some of the boxes of the shipment. As a witness at the trial he expressed the opinion that the plums then could be stored for six weeks without any trouble. He too did not claim to be an "expert" but he had the knowledge based on long experience in examining and storing plums and other fruits.

Plaintiff's 998 crates of plums were removed from the Seaboard refrigerator warehouse late in the evening of September 28th in an Erie Railroad refrigerated car and were taken to a refrigerated lighter of the Erie Railroad at Dock 8, Jersey City, located about a mile away. There they were stencil marked and inspected by Mr. Joseph Fichera on September 29th. He was paid five cents a case by the plaintiff for stenciling and inspecting. His inspection was to see whether the plums were bad or sound, and to see that they were properly crated. He saw no signs of any damage to the plums. If he had, he would have reported it to plaintiff.

The plums were moved in the refrigerated Erie lighter from the Jersey City dock to a position alongside the M/S Helena, a trip of about 2½ hours late on the 29th or early on the 30th. They were loaded aboard the ship about 8 A.M. on September 30th and stowed in reefer compartment 4, 'tween decks, starboard side. Two bills of lading and dock receipts, each for 500 boxes of plums (a total of 1,000) were given by defendant's agents, the master and dock superintendent, showing the delivery of the plums in apparent good order and condition. The documents bore a stamped legend that the shipment was to be carried as

refrigerator cargo in a refrigerating compartment in which the air temperature was to be maintained between 35° and 41° Fahrenheit. Plaintiff paid defendant $2,030 as freight in advance and had paid $1,000 railroad freight to have the plums brought here from California. Presumably there was a market for plums in the populous metropolitan area of New York. Plaintiff's president had been in the business of exporting fruit to the Carribean for many years. He too must have firmly believed the plums were in good condition and fit for the voyage, or he would not have shipped them.

The defendant called as a witness Mr. Pascal P. Pirone, an expert on flowers and fruits. In answer to a hypothetical question he expressed the opinion that the plums as described in the report of Mr. Beach were "within a week of marketing time, ten days at the outside". I prefer the opinion of the men whose business it had been, for over ten years, to inspect plums and other fruits, as many as twenty carloads a month. They saw the plaintiff's plums. The defendant's expert did not. He testified that plums could be properly stowed only under a temperature of 31 to 32 degrees Fahrenheit and that plums that came from California by rail could not be successfully shipped abroad. But it is a practice in the fruit selling and shipping business to make such shipments. If defendant's expert is correct as to the required storage temperature for plums, why did the bills of lading of the M/S Helena prescribe a refrigerated temperature of 35° to 41° F, according to the stamp defendant placed on its bills of lading?

Plaintiff's shipment of 998 boxes of plums was stowed in starboard reefer of 'tween deck No. 4 on defendant's M/S Helena. There were two other shippers of plums, whose fruit was stowed in the same reefer: Manniello Bros. and Manniello Inc.'s 125 cases, and New York Export Co. Inc.'s 150 cases. All of the New York Export's said shipment of 150 cases of plums were ordered condemned by the health authorities at LaGuaira and were destroyed; and 25 of Manniel-

lo's cases were likewise condemned. Later Manniello claimed damage to his entire shipment. The health authorities also ordered condemned and destroyed 25 boxes of plaintiff's plums, and they would have condemned and destroyed all of plaintiff's shipment if it were not for the intervention of plaintiff's officer, Krupnick, who was there with plaintiff's local agent, Perez y Perez, and showed the authorities how parts of the shipment could be salvaged by separating the good plums in a box from the damaged plums and repacking the good plums. The authorities then permitted plaintiff to send its entire shipment to Caracas, a distance of seven miles, where they were sorted by the two concerns, Rodriguez and Berardini, to whom they had been sold September 23rd. Those two concerns succeeded in salvaging slightly more than half of plaintiff's said shipment. This will be further discussed on the question of damages.

Defendant's theory that the inherent vice of plaintiff's plums resulted in their damage is further disproved by what happened to the plums of two other shippers, Manniello Bros. and Manniello Inc. and the New York Export Co., Inc., who also had shipped crates or boxes of plums which were stowed by defendant in the same refrigerating compartment ('tween decks reefer No. 4, starboard) in which plaintiff's plums were stowed. They were all received aboard in apparent good order and condition according to the dock receipts. Plums of those two other shippers were also discharged in a damaged condition and over 175 crates or boxes of their plums were condemned and destroyed by the port authorities at La-Guaira.

■ The plums of plaintiff and the plums of the two other shippers were subjected to the same conditions of stowage and refrigeration while stowed in the refrigerated compartment ('tween deck No. 4 starboard) for a period of thirteen days from New York to La-Guaira. During seven of those days the M/S Helena was in a tropical zone. If a proper temperature for stowage of the plums under those conditions was not

that specified in defendant's bill of lading (35° to 41° F) that would account for the deterioration or damage to the plums of all three shippers; or if the temperature specified was not continuously maintained that too would account for the damage. Lack of proper refrigeration would be a common cause affecting the plums of all three shippers. If that was not the cause of the damage, what was it? The burden was on the defendant to explain.

All the plums (plaintiff's, Manniellos' and New York Export Co.'s) stowed in this starboard reefer of 'tween decks No. 4, were subjected to the same conditions aboard the M/S Helena from the time they were stowed in that reefer on September 30, 1953, at the port of New York, until they were discharged on the dock at LaGuaira on October 13th. It is a fair inference that something in the conditions prevailing in the reefer, or in their manner of stowage therein, adversely affected the plums and resulted in their damage as found on their discharge at LaGuaira. It was a common cause that produced the damage to the plums. That is an argument from induction, a form of reasoning approved in Baxter v. Doe, 142 Mass. 558, 561, 8 N.E. 415; Hunt v. Lowell Gas Light Co., 8 Allen 169, 90 Mass. 169; Shea v. Glendale Elastic Fabrics Co., 162 Mass. 463, 38 N.E. 1123; Wigmore (3rd Ed.) §§ 442, 446. In those cases plaintiffs had the burden of showing that the common cause of their ailments emanated from the defendant.

But in a case where the defendant is a carrier of goods by sea, if the shipper proves that the goods were in good condition when delivered to the carrier, the burden is on the carrier to prove what caused the damage to the shipper's goods, if they are discharged in a damaged condition. If the carrier cannot explain the loss, or " * * * explaining, bring within the exceptional case in which he is relieved from liability", the law casts upon the carrier the burden of the loss. The reason for this is that "[d]ischarge of the duty [as bailee of the shipper's goods] is peculiarly within his control" and "[a]ll the facts and circumstances upon which he may rely to relieve him of that duty are peculiarly within his knowledge and usually unknown to the shipper". Schnell v. The Vallescura, 293 U.S. 296, 304, 55 S.Ct. 194, 196, 79 L.Ed. 373; Schroeder Bros. Inc. v. The Saturnia, 2 Cir., 226 F.2d 147. It is not a harsh rule. For sound reasons the burden is placed where it belongs.

The defendant produced a temperature chart of starboard reefer of 'tween deck No. 4 which on its face appears remarkable for the uniformity of the entries thereon, (3° C) every two hours from October 2nd to October 13th, the time of the discharge. This uniformity evidently aroused the interest of one of defendant's representatives who requested an explanation of it from the engineer of the M/S Helena. The explanation he received appears in a letter (Ex. 33) from which I quote the following:

"2. Attached you will find the original logs of the temperatures maintained in the coolchambers of Nr. 4 Hatch. From these lists you will see that when in the boxes the temperature of ± 3°C. was reached constantly 3°C. has been mentioned. The Chief-Engineer, H. v. Kuyk is presently on leave here and we requested him why this was done. He explained to us that each 2 hours the temperature is taken down on a rough copy and later on a fair copy is made. Although the correct temperatures are taken down, on the fair copy only the average temperature is noted if these temperatures show a small difference of half a degree. Only when the temperature noted down surpasses the red lines (drawn in the temperature lists by the ships officer)—thus when the temperature in the coolbox is higher resp. lower then the maximum resp. minimum temperature — the real temperature is noted in the lists. The rough-copies are destroyed after use."

The temperature chart was not the result of any automatic recordation, nor is it the original record made by the man who inspected the reefer's thermometer and read the temperature thereof. Those original papers, the rough sheets, were not preserved. There is no proof as to when the temperature record (Ex. F-1) was made, whether the entries thereon were all made at the same time or at different times, or how soon they were made after the temperature record was put on the first or rough paper. But this much appears, that if the temperature record was made subject to the above instructions then it recorded something other than what the thermometer indicated, and further the temperature record itself (Ex. F-1) shows that those instructions were not followed on September 29th and 30th or on October 1st and 2nd.

In the deposition of the Chief Officer, taken by defendant June 22, 1955, he stated that he did not observe any damage to the cargo while it was being discharged from the M/S. Helena (October 13th) nor did he have any damage to the cargo called to his attention *at that time.* He said nothing about the damage to the cargo that he saw when the cargo was in the Customs shed that same evening. In the Captain's letter of October 15th (Ex. 20) addressed to the defendant's office at Amsterdam, he described how at 7:30 P.M. Messrs. Gudde and DeWinter (of defendant's local agency) came to the Captain and requested him "to inspect the reefer cargo in the shed, because so much was spoiled" and that "[a]ccompanied by the Chief Officer and Chief Engineer" he "fulfilled the request and took in one thing and another". If the Captain saw the damaged fruit in the Customs shed and the Chief Officer was with him, he too must have seen it, but the Chief Officer did not mention that in his deposition. He limited his testimony to what he saw as the cargo was being discharged from the ship to the dock. The Captain's deposition was never taken and he was not a witness at the trial. The engineer died quite some time before the trial.

At the trial defendant also contended that the damage to plaintiff's plums was due to the alleged fact that after being unloaded at LaGuaira they were permitted to remain in the sun too long, on the open end of the pier, and were not promptly removed to the Customs shed. The Captain had made a general statement to that effect in his letter of October 15, 1953 (Ex. 20) concerning fruit unloaded from the M/S Helena, but he did not specify which shipper's fruit was involved. However, that argument was rejected by defendant's agent in Caracas in a "P.S." to a letter of November 12, 1953 (Ex. 22) which stated:

"P.S.—With regard to possible spoilage due to exposure to sun and heat during transportation from ship to Customs sheds we would like to add that as the fruit arriving via our vessels is received right along in good shape without spoilage and as far as shore transportation is concerned is always handled the same way, it must be reasonably assumed that the exposure to sun and heat between ship and warehouse could hardly be taken this time as the reason for spoilage."

The Chief Officer, Vermeulen, in his deposition (Ex. I), makes no mention of any undue delay in the removal of the reefer cargo to the Customs shed, after its discharge at the end of the dock. Defendant had the burden of proof on this special defense under subsection 4(2)(q) of the Act, hereinabove quoted in footnote No. 1. The burden was not sustained.

The only proof offered on the question of damages came from the plaintiff. The defendant offered no proof. Defendant's attorney did not even cross-examine the plaintiff's president on that issue, when he testified that the plums would have been worth $9,000 at LaGuaira, the port of discharge if delivered there in good condition; and that

in the damaged condition in which they were delivered they were worth $4,000. New York, L. E. & W. Railroad Co. v. Estill, 147 U.S. 591, 616, 13 S.Ct. 444, 37 L.Ed. 292; The President Arthur, D.C., 28 F.2d 391 and cases cited therein. The difference between the two figures was the sum for which plaintiff sued.

Plaintiff put in further proof which showed the price at which plaintiff had sold the plums to its two customers in Caracas on September 23rd ($6,859.-10); and that because of the damaged condition of the plums when delivered by defendant at LaGuaira defendant received from the customers only $3,062.-17, after they had sorted and repacked the good plums and sold the same. Schwinger v. Raymond, 83 N.Y. 192, 199; Sedgwick On Damages (Ninth Edition, § 852, p. 1762). The difference ($3,796.-93) was the amount plus interest from October 13, 1953, for which the Court directed judgment at the end of the trial.

Defendant's attorney objected to the admissibility of Exhibits 12, 13A, 13B, 14, 15, 16, 19A and 19B as containing hearsay. All of them, except Exhibits 19A and 19B were submitted to defendant's agent, Funch, Edye & Co., in New York with plaintiff's claims. In the four months the agents retained the documents the defendant had ample opportunity to check their accuracy. Defendant rejected plaintiff's claims on the ground that there was no liability. Defendant did not question the amount of the claim or its computation, or ask for any further proof. Exhibits 12 and 13A showed what had been realized by the ultimate consignees in Caracas in salvaging part of the shipment pursuant to an arrangement which plaintiff's president Krupnick testified he made with Voss, defendant's agent at LaGuaira. It was plaintiff's duty to reduce its loss as much as possible and it was to defendant's advantage that this be done. These reports of what was ultimately received for the plums showed plaintiff's actual loss. They formed the basis for entries made on Exhibit 14, the statement plaintiff's agent, Perez y Perez,

forwarded to plaintiff, which plaintiff used in making its book entries.

Plaintiff's president, Krupnick, testified that the items shown in the statement attached to Exhibit 14, were properly recorded on the books of plaintiff. Defendant did not cross-examine Krupnick with respect to the agent's accounting showing the loss sustained. Nor did defendant call for the production of plaintiff's books and records in relation to the entries made therein, based on these reports. The defendant could have inquired through Voss into the accuracy of the agent's reports, in the four months Funch, Edye & Co. had the statements. Defendant did not take the testimony of Mr. Voss by interrogatories nor produce him at the trial, although the court afforded defendant's attorney an opportunity to do so. The defendant's attorney also strongly opposed a course the Court planned to follow of having the testimony of the ultimate consignees in Caracas taken by interrogatories and thus eliminate any question of hearsay. He said in effect that he preferred to have the admissibility of the exhibits as the basis for an appeal. The trial of a lawsuit is a search for the truth. I had occasion to remind defendant's attorney of that principle during the trial. When technicalities are relied upon to block the establishment of what appears to be a valid claim, the Court should suggest ways in which the technicalities may be overcome. This the Court did, but the defendant's attorneys would have none of it.

Defendant's attorneys demanded that the Court pass upon their motion to dismiss the complaint on the record as made. The Court denied the defendant's motion and directed judgment for the plaintiff for $3,796.93, as hereinabove stated.

The Court directed plaintiff to submit proposed findings and stated that the Court would prepare a memorandum. Plaintiff's proposed findings and a proposed judgment were served and filed. Defendant's attorneys were permitted to file a criticism of the proposed findings

and included therein suggested findings of their own. The exhibits in the case were received from counsel by the Court and the court reporter furnished the Court with a copy of the Stenographer's minutes. After a careful examination in Chambers of the exhibits and of the stenographer's minutes of the trial I adhere to the judgment I directed at the end of the trial.

In preparing a memorandum to accompany the findings of fact, as originally contemplated, the memorandum grew in size and became in fact an opinion, containing all the essential findings of fact. In addition it discussed the evidence, stating my reasons for reaching the conclusions I have reached. It also cited legal authorities on the questions of burden of proof and measure of damages. It therefore is unnecessary to file in addition formal findings of fact. Rule 52 (a) F.R.Civ.Proc., 28 'U.S.C.A. The Clerk of the Court will enter judgment for the plaintiff against the defendant for $3,796.93, with interest thereon from October 13, 1953, and the plaintiff's proper legal costs.