310 F.2d 206
 STATES MARINE CORPORATION OF DELAWARE, a Corporation, Appellant,
v.
PRODUCERS COOPERATIVE PACKING CO., Stokely-Van Camp, Inc.,
Springbrook Packing Company, Winndixie Tampa Inc.,
and Stanislaus Food Products Co., Appellees.
STATES MARINE CORPORATION OF DELAWARE, a Corporation, Appellant,
v.
CALIFORNIA PACKING CORPORATION, Hollister Canning Company,
Hunt Foods, Inc., Richmond-Chase Growers, Inc., Appellees.
 Nos. 16931 and 16932.
 United States Court of Appeals Ninth Circuit.
 Aug. 21, 1962, Rehearing Denied Nov. 13, 1962.
 
 Dorr, Cooper & Hays, John Hays and George L. Waddell, San Francisco, Cal., for appellant.
 Derby, Cook, Quinby & Tweedt, Robert H. Thede, and Thomas R. Kerr, San Francisco, Cal., for appellees in 16931.
 McCutchen, Doyle, Brown & Enersen, Russell A. Mackey and Bryant K. Zimmerman, San Francisco, Cal., for appellees in 16932.
 Before POPE, BARNES and JERTBERG, Circuit Judges.
 POPE, Circuit Judge.
 
 
 1
 These two cases, consolidated for trial in the district court and in this court, rose out of certain shipments of various quantities of canned goods and dried fruit received by the appellant aboard its ship SS Empire State for carriage from loading points at Seattle, Vancouver, Alameda and Stockton, to various ports of discharge on the Gulf of Mexico including Tampa, Mobile and New Orleans. In each case the libelants-appellees allege the delivery to the carrier of the cargo in good order and condition for transportation; the discharge of the cargo at destination, and the carrier's failure and neglect to deliver the same in like good order and condition, but on the contrary. in a damp, stained, dented, rusty and moldy and otherwise damaged condition.
 
 
 2
 The respondent-appellant in answer admitted receipt of the goods in apparent good order and condition; denied that libelants had been damaged by reason of any fault, neglect or breach of contract on their part, and denied all the other allegations of the libelants generally. It alleged that if there were any damage to the goods the same resulted from one or more of the excepted causes under the Carriage of Goods by Sea Act, namely, perils of the sea, act of God, inherent vice, insufficiency of packing, or some other cause arising without the fault of the carrier or its agents.
 
 
 3
 Upon trial of the consolidated cases and the receipt of evidence, oral and documentary, the trial court made its findings of fact and conclusions of law in which it found that these various quantities of canned goods and dried fruit were delivered to the respondent as a common carrier in good order and condition for carriage to the Gulf port; that the respondent issued clean bills of lading covering each of the shipments, which bills of lading incorporated the provisions of the Carriage of Goods by Sea Act; that SS Empire State proceeded to points of discharge at Tampa, Mobile and New Orleans, and discharged the shipments, 'with external evidence of moisture damage, with certain cases short, with numerous cases of canned goods damp, stained, tainted and rusty, and with numerous cases of dried fruit, damaged, stained and moldy, by reason of which each of said shipments was damaged and depreciated in value.' The court found and determined the amount of damage sustained by each shipper found that the damaged condition of the shipments 'was caused or contributed to by rain during the loading of cargo at various Pacific Coast ports and by 'sweat' or condensation occurring while said shipments were on board said vessel.' It found that the respondent was negligent in the loading, stowing and carrying of said shipments, and that such negligence caused the damage; that such damage was not caused by perils of sea, acts of God, inherent defect, quality or vice of the cargoes, insufficiency of packing, or by any other cause for which the respondent is excused from liability by the contract of carriage or by law. The court found the amounts which the various libelants were entitled to recover from the respondent. Final decree was entered accordingly.
 
 
 4
 Appellant's principal attack upon the decree of the trial court amounts to an argument that there was insufficient proof to warrant the findings. In the main it may be said that appellant's effort is to establish on the basis of the evidence in the court below that the trial court's findings are clearly erroneous; that there was insufficient evidence to prove negligence in loading or in caring for the cargo during the voyage or that there was adequate packing of the goods and freedom from inherent vice; and that there was insufficient proof to warrant the extent of the damage found by the court.
 
 
 5
 It is clear that any discussion in this opinion of the evidence in the trial court would have no value as a precedent in any other case and hence such a discussion would serve no useful purpose so far as establishment of any rule of law is concerned. We think it is sufficient to say that we are satisfied from the examination we have made of the record that the evidence was sufficient to warrant findings such as those made by the court.
 
 
 6
 The appellant does, however, urge that the trial court, in reaching its conclusions disregarded the rule of the Neil Maersk, 2 Cir., 91 F.2d 932. It is asserted that the damage in this case may have resulted in whole or in part from inherent vice of the goods, or insufficiency of packing, and that under that decision it was incumbent on libelants to produce evidence to disprove any such conditions.
 
 
 7
 We think that the trial court in its opinion, which is set forth in full in the margin,[1] adequately distinguishes the Neil Maersk case. The sweat damage to the canned goods was not due to any concealed vice in the cans. The evidence of damage to the canned goods as disclosed by surveys on the discharge of the cargo, disclosed that 'cases were damp, labels distorted, and cans rusty.' There was sufficient evidence that these conditions were attributable to the permitting of rain to fall in the hatches, the failure adequately to ventilate, and excessive moisture in the bilges. There is no reason for questioning the court's conclusion that the shipper had a right to rely upon the recitals of the bills of lading relating to 'apparent good order and condition'. Such was the case with respect to the canned goods.
 
 
 8
 As for the dried fruit, while an examination of the exterior of the containers might not disclose the condition of these goods as readily as would an examination of the canned goods, yet the evidence showed specifically that the dried fruits were, as to contents and packing, in a condition ideal for proper keeping and shipment, and that the mold which was found on unloading would not be produced unless these goods had been subjected to severe wetting and allowed to remain in that condition for in excess of two weeks. In other words, as to the dried fruits, adequate proof of the good condition and proper packing of the shipments when made is furnished in the record.
 
 
 9
 An aspect of the case which gives us more trouble has to do with the appellant's first specification of error to the effect that the district court 'erred in the degree or quantum of proof which it required of respondent to establish its freedom of negligence causative of the damage * * *.' In a situation such as this, where the goods were received in good order and condition for shipment, and outturned in a damaged condition, the rule relating to the carrier's burden of proof is stated in Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373. There the court said: (p. 306, 55 S.Ct. p. 197) 'Where the state of the proof is such as to show that the damage is due either to an excepted peril or to the carrier's negligent care of the cargo, it is for him to bring himself within the exception or to show that he has not been negligent.' The court also said (p. 305, 55 S.Ct. p. 196): 'If he delivers a cargo damaged by causes unknown or unexplained, which had been received in good condition, he is subject to the rule applicable to all bailees, that such evidence makes out a prima facie case of liability. It is sufficient, if the carrier fails to show that the damage is from an excepted cause, to cast on him the further burden of showing that the damage is not due to failure properly to stow or care for the cargo during the voyage.'
 
 
 10
 While neither side has been able to furnish us with any authority as to the nature or extent of this burden of proof which is on the carrier, we take it for granted that under the circumstances here mentioned, the carrier satisfies that burden if he proves by a preponderance of the evidence that the damage was not due to his own fault or failure properly to stow or care for the cargo during the voyage. This burden of proof by the preponderance of the evidence is that ordinarily and commonly applied in civil cases. Of course there are extraordinary and special cases in which a greater burden of proof may be required to satisfy what is requisite in the particular case. In those instances it may be that the evidence must be 'clear, unequivocal and convincing'. Schneiderman v. United States, 320 U.S. 118, 125, 63 S.Ct. 1333, 87 L.Ed. 1796; Baumgartner v. United States, 322 U.S. 665, 670, 64 S.Ct. 1240, 88 L.Ed. 1525. See also Wigmore on Evidence, 3d ed., 2498. But as those cases indicate, the burden of proving some fact by 'clear and convincing' evidence is a burden above and beyond that required where the proof must be by a 'preponderance of the evidence'.
 
 
 11
 The trial judge's memorandum opinion in which he directed the libelants to file proposed findings of fact and conclusions of law in accordance with the opinion, was followed on January 22, 1960, by the formal findings to which we have previously alluded. What causes us concern is the fact that in the opinion, (see footnote 1, supra) the court made the following statement: 'In a situation fraught with the possibility of samall errors causing large amounts of damage, respondent-- if it is to escape liability for the heavy damage which in fact ensued-- must come forth with a clear and convincing demonstration that it is blameless. Concededly, the burden upon the carrier is cumbersome; but it is put there by law.' This suggests that before the court could be convinced that the carrier had performed its obligation to 'properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried', the carrier must come forth with 'clear and convincing' proof to that effect; and that the trial court would therefore not be satisfied if such care were proven and established by the mere preponderance of the evidence.
 
 
 12
 This we think is a matter of some importance in a case of this kind where the record before the court was such that the trial court might find for either party and where, whatever its finding, we would be unable to set the same aside as clearly erroneous. If we were dealing here with the formal findings themselves, not affected by what may have been said in the court's opinion, we would clearly be obliged to sustain those findings as not clearly erroneous. Cf. McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20.
 
 
 13
 This court has on occasion felt obliged to take note of the trial court's opinion when evaluating the court's formal findings. Thus in Mar Gong v. Brownell, 9 Cir., 209 F.2d 448, 450, we said: 'Fairness to the appellant requires us to examine the findings in the light of the court's opinion', noting that the rules of civil procedure require a court's opinion in a case tried without a jury to be made a part of the record on appeal, and deducing from that that the court is authorized to examine the opinion for the purpose indicated. In Ly Shew v. Dulles, 9 Cir., 219 F.2d 413, this court vacated and remanded for further findings a judgment based upon the district court's findings that certain plaintiffs had not proven their American citizenship. The remand was based upon the fact that the district court's opinion disclosed that the court had 'proceeded on the theory that the burden of proof * * * was different from and heavier than the ordinary burden of proof resting on the plaintiffs in civil actions-- a theory which was and is untenable'. The opinion of the district court on which this ruling was based contained the following statement: 'Where entry into the United States is sought upon the basis of the entrant's claim to United States citizenship, the rule is that the proof of the alleged citizenship must be clear and convincing.'[2] (Ly Shew v. Acheson, D.C., 110 F.Supp. 50, 58)
 
 
 14
 We recognize the possibility that the trial court in this case may have used the words 'clear and convincing demonstration' inadvertently; or that in view of the context it might have used them having in mind merely that in connection with winter voyages involving special hazards an appropriate degree of care to meet those circumstances is required. However, in fairness to the appellant, we cannot assume that the use of this language indicating that the trial judge was placing a greater than ordinary burden of proof upon the carrier was inadvertent and unintentional and had no effect upon the findings themselves.
 
 
 15
 Accordingly, we feel that we must in this case make a disposition of it similar to that made in the Ly Shew case, supra. The decree is vacated and the causes are remanded with directions to make findings in the light of this opinion and upon the assumption that the burden of proof upon the carrier was no more than the ordinary burden of proof by the preponderance of the evidence.
 
 
 16
 Remanded for further findings.
 
 
 17
 On Petition for Rehearing.
 
 
 18
 PER CURIAM.
 
 
 19
 In a petition for rehearing appellant renews its argument that the case of The Neil Maersk, 2 Cir., 91 F.2d 932, should control here. The contention is that the result here is an improper holding that thr rule of that case 'is limited to 'concealed vice".
 
 
 20
 The later decisions of the Second Circuit, referring to Neil Maersk, show that petitioners are mistaken. See Hecht, Levis & Kahn, Inc. v. The S.S. President Buchanan, 2 Cir., 236 F.2d 627, 631, where the reference is to a 'hidden defect'. This appears to be in accord with what the trial court said about 'concealed vices'. Its statement that the conditions of the cargo items 'are not concealed vices' is a finding of fact which we are not permitted to disturb.
 
 
 21
 This conclusion made it unnecessary for us to consider the plausible suggestion that in the light of Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373, the rule of the Neil Maersk case cannot be properly applied in a case like this where there was evidence of carrier's negligence contributing to or enhancing the damage.[3] The facts in Albers Bros. Milling Co. v. Hauptman, 9 Cir., 95 F.2d 286, were wholly different from those in the present case.
 
 
 22
 The petition for rehearing is denied.
 
 
 
 [1]
 'MEMORANDUM OPINION-- Roche, Judge: These two causes of action, having been consolidated, were brought for damages to canned goods and dried fruit shipped aboard the SS Empire State from various ports on the west coast to various ports on the gulf coast early in 1956
 'Between January 7 and January 22, 1956, the Empire State loaded cargo-- including that owned by libelants which is the subject of these actions-- for shipment to the gulf coast via the Panama Canal and Havana. She loaded cargo at Seattle, Washington, on January 7 and 8, during which time the weather was cloudy with temperatures generally in the 40's. She arrived at Vancouver on January 9 and continuel loading cargo there until the morning of January 11. The log records almost continuous light rain or drizzle while at Vancouver, with temperatures again in the 40's. On January 13 the Empire State docked at Eucinal Terminal in Alameda, California, and loaded canned goods through the 14th. It rained steadily both days, with temperatures in the 50's and the log records that all loading was suspened for 6 hours on January 14 due to heavy rain. The Empire State moved to Stockton on the 15th and loaded cargo for two days. There is no record in the ship's log of precipitation while in Stockton, but one daily hatch log describes the 'weather conditions' as 'rain'. The temperature continued to hover about the 50's. The vessel returned to Alameda on January 17, loaded cargo for a few hours in what is described as cloudy weather, and departed for San Diego the same day, arriving there on January 19. The Empire State loaded mostly deck cargo in San Diego. No rain was recorded and temperatures were in the high 50's. Arriving at Long Beach on January 20, the vessel loaded cargo for 2 days in weather ranging from haze to light rain with temperatures in the 50's and 60's. Early on January 22 she departed Long Beach bound for the Canal Zone.
 'It is recorded in the log that orders were received on January 8 not to ventilate the cargo spaces during the voyage in order to prevent sweat damage. It is also noted that hatch tents were rigged when loading in rainy weather. However, no hatch tents were rigged in Stockton. The log records frequent accumulations of water in the bilges while loading and during the voyage, especially in No. 3 hold.
 'Throughout the voyage temperatures consistently reached the 80's and the weather was humid as well as warm, with some rain. The Empire State arrived at Havana on February 3. Cargo was discharged commencing on the 4th, and on the 6th, wet cartons were removed from the lower 'tween decks in the square of Number 3 hatch. There was light rain on February 7. The temperature reached the 90's every day the Empire State was at Havana. On February 10 she departed for Tampa, arriving the next day. The stevedores came aboard on the 12th and unloaded cargo in weather that is described as clear with temperatures in the high 50's and low 60's. Captain Jones, a marine surveyor, came aboard to survey the damaged cargo and it is noted that a considerable amount of wet cargo (canned goods) was found in the square of Number 3 hatch. Libelants' damages consisted of rust and spoiled labels on the canned goods and mold and dampness in the dried fruit.
 'The rights and duties of the parties are set forth in the Carriage of Goods by Sea Act of 1936, 46 U.S.C.A. 1300-1315. Libelants contend that respondent fell short of its obligation to 'properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried.' Respondent alleges that libelants failed to establish a prima facie case, and, furthermore, that the loss is attributable to one or more of the following excepted causes: Peril of the sea, Act of God, inherent vice, insufficiency of packing, some other cause arising without the fault of the carrier or its agents.
 'In substance, it is respondent's position that libelants' damages were caused by a not unusual shipboard phenomenon known as 'sweat,' i.e., condensation which occurs when the temperature of the air falls below its dew point. It is evident that when canned goods are transported on a winter voyage from a cool, rainy climate to a warm, moist one-- the shipper and carrier having followed the standard and customary practices of their trades, but nothing more-- the danger of sweat is present and the probability of some damage resulting therefrom not unlikely. But sweat is considered to be a peril of the sea only when all available and reasonable precautions are taken to avoid it. If the damage could have been avoided by the exercise of proper care, then the carrier is liable. (cases cited) The law casts the burden of explanation upon the carrier. He is prima facie liable for the damage unless he can affirmatively show that the cause is one for which the law does not hold him responsible. (cases cited) Hence, to avoid liability, respondent must prove that all reasonable precautions were taken to avoid the damage.
 'Libelants contend that defects in respondent's loading and ventilating procedures caused their cargos to become wet from sweat and rain, the damage occurring as a consequence thereof. Respondent presented a number of witnesses who testified that the general practices employed by respondent with respect to the loading, stowing and transporting of canned goods are customary and proper. With this the court takes no issue. But these practices must be accompanied by the exercise of discretion in their application before the carrier has fulfilled its obligation. Intercoastal voyages in the wintertime are inordinately hazardous operations with respect to the safety of the cargo and impose heavy responsibilities upon the carrier. In a situation fraught with the possibility of small errors causing large amounts of damage, respondent-- if it is to escape liability for the heavy damage which in fact ensued-- must come forth with a clear and convincing demonstration that it is blameless. Concededly, the burden upon the carrier is cumbersome; but it is put there by law.
 'The explanation offered by respondent was neither clear nor convincing. Respondent spent much time establishing that the practice of sealing holds under the conditions that prevailed is acceptable but did little to persuade the court that the Empire State's holds were, in fact, adequately sealed, in spite of libelants having raised substantial doubts on that issue. The Chief Mate was unable to testify that anything had been done to seal the exhaust vents. Both he and the Captain were unfamiliar with the practice of sealing the holds to prevent sweat. Furthermore, there was no explanation as to why the Empire State failed to carry the instruments which are available to measure the dew points in the holds. Their use might have resulted in more flexible-- and more satisfactory-- ventilation.
 'It was incumbent upon respondent to demonstrate that its precautions while loading in the rain were adequate to preclude substantial amounts of moisture from entering the holds. It is recorded in the fog that at 1100 hours on January 14, loading stopped in Numbers 1 and 3 lower holds and commenced in Numbers 1 and 3 'tween deck holds, and tarpaulins were spread over the hatches in the lower holds to keep out rain. The log records steady rain from 1600 hours the previous day. What was there-- other than hatch tents which apparently were not satisfactory and a brief suspension in loading-- to keep out the rain which fell for 19 hours before the tarpaulins were spread? The use of two hatch tents at Number 3 hold resulted in twice the usual number of openings for rain to enter. Captain McLaughlin, master of the Empire State, admitted that rain had been getting into the lower holds. Captain Noyes, employed by States Marine, referred in his testimony to the use of sawdust in the holds to soak up water, indicating that a significant amount was getting in. There are log entries that wet cargo was discovered at Tampa and Havana in the square of Number 3 hatch. Respondent did not attempt to account for the fact that water accumulated in the bilges-- especially Number 3 hold-- from time to time; the possibility that these accumulations were composed in part of rain water cannot be excluded. And there was testimony that the dried fruit would not mold unless subjected to severe wetting and allowed to remain in that condition for in excess of two weeks. The court is not persuaded that respondent's loading procedures in this instance were satisfactory to meet its obligation of due care.
 'On the other hand, respondent failed to demonstrate that the extraordinary amount of damage incurred could be attributed to the period of sweat that would have remained if all reasonable precautions had been taken. There was no evidence that the weather which prevailed while loading and during the voyage varied from the atmospheric conditions which would ordinarily be expected at this time of year, which conditions do not normally result in sweat damage of this magnitude. Hence, respondent not only failed to convince the court that its own conduct was blameless, but in addition, failed to establish a reasonable alternative to its own negligence as a probable cause for the damage. As the Supreme Court stated in Schnell v. The Vallescura, supra (293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373), '* * * the carrier is charged with the responsibility for a loss which, in fact, may not be due to his fault, merely because the law, in pursuance of a wise policy, cast on him the burden of showing facts relieving him from liability.' The court cannot conclude from the evidence that respondent has carried the burden of proving that its fault did not contribute to the damage. Standard Brands v. Thos. & Jno. Brocklebank, 81 F.Supp. 670 (S.D.N.Y., 1948).
 'Respondent directs attention to the established rule that where inherent vice or insufficiency of packaging may have been the cause of cargo damage, libelant, to establish his cause of action, must prove that the goods were in proper order when delivered to the carrier. The Niel Maersk, 91 F.2d 932 (2 Cir. 1937), cert. den. 302 U.S. 753 (58 S.Ct. 281, 82 L.Ed. 582) (1937). Libelants' 'clean' bills of lading are prima facie evidence of good order and condition. * * * If there is an affirmative showing of inherent or concealed vice in the goods which might have caused their damaged condition, the shipper may no longer rely on the 'apparent good order and condition' evidenced by the bill of lading. * * * Or where there is no evidence of negligence on the part of the carrier and the possibility of concealed vice in the goods is very strong, additional proof from libelant may be required * * *. But when, as in the instant case, there is evidence of negligence on the part of the carrier adequate to explain the damage and there is no substantial evidence to rebut the shippers' prima facie showing of good order and condition, the shipper need go no further. Kupfermann v. United States, supra (2 Cir., 227 F.2d 348); Karabagui v. The Shickshinny, supra (D.C., 123 F.Supp. 99). Those cases requiring an affirmative showing of carriageable condition deal with products much less uniform and far more susceptible to inherent vice than standard cannel goods. The quantity and variety of goods that were affected-- 45% of the canned goods on board including consignments from 9 different libelants-- make the possibility of inherent vice remote. Furthermore, the principal cause of the damage here is not unknown. It is sweat, a phenomenon rarely if ever attributable to any inherent or concealed vice in the goods. The two characteristics which might have contributed to the damage-- wet cartons and excessive coldness-- are not concealed vices. They are apparent qualities on which the 'clean' bills of lading are conclusive. Respondent offered testimony that libelants' canning and packaging techniques may not be the ultimate as far as safety of the goods during transit is concerned. But he failed to show that they were not adequate to put these goods in reasonably good order and condition to withstand the ordinary hazards of ocean voyages; the court cannot say that more is required. Lastly, with regard to the dried fruit, there was affirmative evidence that its moisture content was ideal for shipping.
 'Respondent complains that libelants did not prove their damages satisfactorily. However, there is no dispute at all that portions of libelants' cargos did suffer damage and, with one exception, respondent offered no evidence raising substantial doubts as to the correctness of the amounts claimed. In the absence of rebuttal the court will allow libelants' figures to stand. Manhattan Fruit Export Corp. v. Royal Netherlands Steamship Co., supra (D.C., 175 F.Supp. 771). The one exception is the claim of Hunt Foods, which claim is in part contradicted by the testimony and survey report of Captain Jones. That claim appears to be excessive in the amount of $112.00.
 'Although it is probable that a portion of libelants' damages is attributable to an unavoidable peril of sweat, in the absence of a showing by respondent as to what portion is so attributable, it must bear the entire loss. Schnell v. The Vallescura, supra.
 'Each libelant is entitled to judgment for its full claim, with the exception of Hunt Foods which is entitled to judgment for its reduced claim as determined above. The amounts are as follows: (Tabulation omitted)
 'Libelants will file Findings of Fact and Conclusions of Law in accordance with the foregoing.'
 
 
 [2]
 In that case, differing from the present one, the court disclosed that the words 'clear and convincing' were used with a conscious intent on the part of the court to require a high standard of proof. The possibility of the term having been used inadvertently was thus negatived
 
 
 [3]
 See, Knauth on Ocean Bills of Lading (3d Printing, 1947) p. 150: 'It is instructive to compare the Neil Maersk case with the Vallescura decision, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373, 1934 A.M.C. 1573. In each instance cargo was damaged by two different causes, and the effects of these causes could no be separated.' And see also Gilmore and Black, 'The Law of Admiralty', p. 151: 'Thus, on the whole, the better supported and sounder view would seem to be that, where a carrier brings himself under one of these excepted causes, he may nevertheless be held liable if his negligence concurred as a cause in producing the damage or was itself a cause of the incidence of the peril.'